## THE WILLIAM W. WOOD.

### WALSH v. THE WILLIAM W. WOOD.

(District Court, D. Connecticut. March 11, 1895.)

No. 1,042.

COLLISION—TUG AND TOW—CASTING OFF—MUTUAL FAULT.

A schooner, towed out through Hell Gate by a tug, got her sails up, and, at a signal of one blast on the tug's whistle, cast off the hawser. The tug shut off steam, but did not starboard her wheel, as is usual in such cases; neither did the schooner port, but, continuing in the same direction, struck the tug, and sunk her. *Held*, that the tug was clearly in fault; and, it appearing from the preponderance of evidence that the schooner could have avoided her by porting, that she, too, was in fault, and the damages must be divided.

This was a libel by William E. Walsh against the schooner William W. Wood for a collision, whereby libelant's tug was sunk.

Edward H. Rogers, for claimant.

Goodrich, Deady & Goodrich, for libelant.

TOWNSEND, District Judge. Libel in rem for collision. On May 1, 1893, the libelant, owner and master of the steam tug Kapella, started, with the claimant's schooner Wood in tow on a hawser, to go from Red Hook, Brooklyn, through Hell Gate. A second schooner, the Three Sisters, tailed astern of the Wood. When the tow arrived off Sunken Meadows, the Wood began to set her sails, and had them all hoisted when rounding North Brothers Island. The collision occurred at a point in the middle of the channel about halfway between North Brothers Island and Riker's Island. No questions of law are presented in the case.

The decision of the question of liability chiefly depends upon the direction and force of the wind at the time of the collision, and the conduct of those in charge of the tug just prior thereto. At about 5 o'clock in the afternoon of said day, the tug and tow were off North Brothers Island, and proceeding in a southeasterly direction, the hawser from the tug Kapella being on the port bow of the schooner Wood. Shortly thereafter the tug blew a whistle, which the schooner understood as a signal to let go the hawser. She did so, and, overtaking the tug, struck her astern, causing her to sink. The libelant denies that he gave a signal to let go, and

claims that at this time the schooner had all her sails hoisted, trimmed, and full, with booms on the port side, and was going so fast, with a strong south-southwest breeze, that the tug, although she put on full speed and starboarded her wheel, could not get out of the way of the schooner; and, further, that the schooner, after having let go, failed to port her wheel so as to go to starboard of the tug. The claimant claims that a single whistle or toot was blown on the tug; that this was the usual signal to let go the hawser; that, as soon as it was given, the tug stopped to slack the line and let the schooner cast it off; that the wind was south-southeast, and was a light breeze; and that, as the schooner was heading southeast, and her sails were flat and shaking, she had no headway, except what she got from the tug; and that the tug failed either to go ahead, or to steer to port; and that, therefore, he could not avoid running on to her. There is not only the usual conflict of testimony, but a number of outside and apparently disinterested witnesses give diametrically opposite testimony as to the customary signals for dropping a tow, as to the direction and force of the wind, and as to the circumstances attending the collision.

It is not necessary to consider at length so much of the testimony as relates to the conduct of those in charge of the tug. The evidence shows clearly that she was to blame. The testimony of Davis, the captain of the Three Sisters, an intelligent and apparently sincere and disinterested witness, is conclusive on this point. He was alongside the tug, heading in the same direction, and not over 150 feet away; and I have accepted, practically, his statement of the circumstances attending the collision, so far as the conduct of those on board the tug is concerned, as confirmed by other witnesses. The tug blew one short blast, and shut off the steam from her engine. The line, which had previously been taut, became slack, and was slipped over the Samson post on board of the Wood, and cast off. The tug did not throw the wheel hard to starboard and sheer to port when she let go, as is customary in such cases; but, according to the statement of Davis, "she lay right there, and was run over,—stopped directly as she had been towing the vessel." In these circumstances, even if the short whistle blown may sometimes be used as a signal to call a deck hand, it would be immaterial. The captain of the schooner had a right to understand the toot as a signal to drop the hawser; he had a right to suppose that the tug would sheer to port, and get out of the way; and she was negligent in stopping as she did, especially with a short hawser, and in thereby incapacitating herself from getting out of the way. Furthermore, whatever may have been the direction of the wind, the evidence clearly shows that its force was not sufficient to have enabled the schooner to run into the tug if the tug had properly increased her speed. The engineer of the tug admits that, with the tug in tow, she was not going more than 5 miles, if she was going that, but that she was capable of going $7\frac{1}{2}$ or 8 miles an hour. His statements strongly confirm the other evidence as to the negligence of the tug. He

testifies that he was in the engine room, where he could not look back, and all he could do was to look straight out on either side; that he did not see the schooner cast off the hawser, and did not know when it was let go; that the first thing that attracted his attention to the possibility of a collision was his seeing the Wood gaining on them, when the end of her jib boom was right by them on the starboard side; and that he then hallooed to go ahead, and opened the engine.

The vital question in this case is as to the negligence of the schooner. If there was a light southeast breeze, and she had no headway, she could not have avoided the collision by porting her wheel. If there was a stiff south-southwest wind,—a whole-sail breeze,—she could have got out of the way. Some of the witnesses swear to a heavy southwest gale; others say that what little wind there was, was about south-southeast. The observations of Sergeant Dunn, of the United States weather bureau, show a south-west wind during the entire day on the top of the Equitable building at New York, with a velocity of 13 miles an hour between 5 and 6 o'clock in the afternoon. The log of the lighthouse keeper at North Brothers Island shows a moderate southerly breeze, which grew lighter and drew a little to the eastward at about 5 o'clock. The log of the steamboat Richard Peck shows a light breeze south-west at 3 o'clock, becoming south at 5 o'clock. Some half dozen other witnesses swear to a south-southwest or southwest breeze; a less number swear to a south-southeast or southeast breeze. Three witnesses, in addition to those already referred to, swear that the wind was southward. The captain of the tug swore to the allegation in the libel (afterwards amended) that the wind was south-southeast. In these circumstances, I incline to think that there was a light breeze, and that it was not east of south, but was practically from the south. The schooner, when she let go her hawser, had at least such headway as she got from the tug. This headway was at the rate of about four or five miles an hour. The captain of the schooner admits that she had steerageway. It is not satisfactorily shown how close to the wind this schooner could sail. The preponderance of testimony is to the effect that the direction and force of the wind and the position of her sails were such that she got some slight assistance from the wind. Although Capt. Davis, of the Three Sisters, testifies that the Wood had no speedway other than what she got from the tug, and that her sails were not trimmed, he also testifies that her foresail was in the wind, her mainsail full, and her jib pulled up. He testifies that his vessel, which was going in the same direction, had her sails set and trimmed, and her booms on the port side. Bartlett, captain of the tug Jones, testifies that the sails of the Wood were set, eased off on the port side, and full. O'Brien, of the tug Escort, testifies that the schooner had wind enough to control her with. Bartlett and O'Brien and the witnesses on the Kapella swore that, if the captain of the schooner had put his wheel to port, he could have avoided the collision. In this connection, it is significant that Capt. Davis, of the Three Sisters, was not interrogated on this point. Walter Wheeler, cook of the

Three Sisters, shows by his testimony, and finally admitted, that he could not tell whether the Wood could or could not have kept out of the way of the tug. It is practically admitted that the captain of the Wood did not port his wheel. I have disregarded the testimony of the landsman Rand on this point. But with a short hawser, with her sails practically set, and the other conditions of wind, tide, and eddies, such as to call for extreme caution, it seems to me that the captain of the schooner Wood was negligent, either in voluntarily letting go the hawser at an unusual place until her sails were in such condition that she could be controlled, or that, whatever the condition of her sails, having let go, he was negligent, when she had steerageway, in not putting her helm to port, in order to avert the collision, after he saw that the tug had stopped and that he was running on to her.

It was not claimed on the trial that his conduct was an error in extremis, and I do not think the circumstances would justify such claim. Inasmuch as the captain of the Wood stands practically alone in his statement that "the result would have been nothing" if he had ported his wheel, I feel bound by the counter statements of eyewitnesses, two, at least, apparently disinterested, to the effect that the collision would have been avoided if he had ported his wheel. The evidence seems to show, as already suggested, negligence on the part of the Wood in letting go the hawser in these circumstances.

Finally, in this conflict of testimony, a suggestion is derived from the point at which the schooner struck the tug. The captain of the schooner said she sagged off onto the tug's starboard quarter. The captain of the tug says the schooner hit the tug just aft of the center of the stern. The conclusion seems irresistible that the captain of the Wood must have been able either to port or starboard his wheel so as to change her direction sufficiently to avoid such an end on collision. Instead of doing so, it appears that neither he nor his mate paid any attention to the tug after they let go, until they struck her.

Let a decree be entered dividing the damages, and referring the case to a commissioner to compute the same.